## DYESS v. HOUSTON LUMBER & BUILD-ING CO. et al.
### No. 9911.

Court of Civil Appeals of Texas. Galveston.

Dec. 21, 1933.

W. H. Graham, of Houston, for appellant.

Stewart & DeLange and Albert J. DeLange, all of Houston, for appellees.

GRAVES, Justice.

An acceptable statement is thus taken from appellant's brief:

"Appellant brought suit in the district court of Harris county against Houston Lumber & Building Company, a corporation, and W. P. Neblett and Minor Stewart, for the purpose of restraining the sale of four separate lots of land in the city of Houston, under four separate deeds of trust given to secure payment of certain second lien notes.

"As against the Houston Lumber and Building Company, which was alleged to own the four second lien notes, appellant claimed: (1) That he had an agreement with the lumber company, when he executed and delivered them, that, when certain events happened, he was to be released from personal liability thereon, and that the liens would be canceled and the second lien notes surrendered; that certain representations were made to appellant to induce the execution of the second lien notes and promises made, which were material and upon which he relied in executing and delivering them, but that the lumber company, though it did release him from personal liability, it did not, upon the happening of the promised events, release the lien securing the second lien notes, nor did it surrender them to appellant, as it had agreed to do, but was attempting to foreclose the lien evidenced thereby; (2) that, even if the second lien notes were valid, in so far as the lien was concerned, appellee Houston Lumber & Building Company was indebted to appellant in specified sums of money, which, if applied to the second lien notes, would practically cancel them, or at least, if proper credits were made, there would be no default in the payment of any installment of interest, so that in no event was the appellee entitled to foreclose its lien, at least at the time it sought to do so.

"Appellant prayed for the cancellation of the second lien notes and the liens securing the same, or, in the alternative, for judgment ascertaining and establishing the amount of credits appellant was entitled to upon the notes, and that, when so ascertained and established by the facts in the case, that the notes and each of them be credited with the sums of money found to be properly due as a credit on each of them and for costs of suit, and for an injunction restraining each of the defendants from advertising and selling the property under the powers of sale contained in the deeds of trust; pending final determination, he asked for a temporary writ of injunction restraining the defendants in the trial court from advertising and/or sell-

642

ing the respective parcels of property, until the final determination of the suit.

"The defendants W. P. Neblett and Minor Stewart were alleged to be trustees in the several deeds of trust; that is, W. P. Neblett as trustee in two of them, and Minor Stewart in two of them.

"The defendants duly answered by general demurrer, certain special exceptions, and by special answer.

"Upon a hearing, the court sustained appellees' general demurrers, and, appellant refusing to amend, judgment was entered, the court denied the injunctive relief sought by appellant (no testimony being offered), and adjudged the costs against appellant."

From the judgment so rendered below, the appeal regularly comes here, the sole question presented being whether or not the trial court erred in sustaining the general demurrers.

■ Since the four separate notes—with attendant liens on one different lot each—cancellation of all of which was sought, are declared to have grown out of the transactions detailed in paragraphs 1 to 4, inclusive, of the trial petition—the other thirteen matters, out of which offsets are claimed, being wholly separate and distinct—and since, in material substance, these four successive counts as to each of the lots and its accompanying lien, respectively, are identical, save as to immaterial details, only the declarations in the first of them will be here set out:

"1. That under date of June 23, 1931, by deed which is of record in book 833, page 221, of the deed records of Harris County, Texas, which was filed for record August 6, 1931, Scott Shambaugh conveyed to plaintiff Lot 21, Block 2, Pineview Manor Addition to the City of Houston, in Harris County, Texas, for a total consideration of $800.00, a portion of which was evidenced by one promissory note for $500.00 payable to said Scott Shambaugh, as therein recited, and a vendor's lien was reserved in said deed to secure the payment of said note;

"That under date of June 15, 1931, plaintiff, J. D. Dyess and wife executed, acknowledged and delivered to J. E. Mitchell, a mechanic's lien contract, which was also signed by the said J. E. Mitchell, and which is of record in book 208, page 620, of the contract records of said county, by the terms of which the said J. E. Mitchell obligated himself to construct a house upon the above described lot, furnishing all labor and material therefor and to complete the same, in consideration of the sum of $4,000.00, which plaintiff and his said wife by said instrument obligated themselves to pay to said Mitchell; and on said June 15, 1931, the said Mitchell assigned said mechanic's lien contract to the defendant, Houston Lumber and Building Company.

"Thereafter, under date of April 16, 1932,

the said J. D. Dyess and wife entered into a written contract with Houston Lumber and Building Company, which is recorded in book 215, page 389, of the contract records of said county, by the terms of which the said $4,-000.00 obligation was renewed and extended into two notes, one being designated as note No. 1, for $2,500.00 as a first lien, the maturities of which are not material here, and the other being designated as note No. 2, for the principal sum of $1,500.00, designated as inferior to said $2,500.00 note aforesaid, said second-lien note for $1,500.00 being made payable in monthly installments of $15.00 each, beginning May 16, 1932, and to further secure the payment of said note, plaintiff and his said wife, under date of April 16, 1932, executed, acknowledged and delivered to the defendant, Houston Lumber and Building Company, a deed of trust conveying the above described property to the defendant, W. P. Neblett, as trustee for the use and benefit of the holder of said note for $1,500.00. Said deed of trust contains a power of sale authorizing the trustee, after default and upon request of the holder thereof, to advertise and sell said property."

The trial petition then, in material substance, further proceeds:

"5. Plaintiff alleges that the defendant is now the owner and holder of all four of said second-lien notes aforesaid, and plaintiff is now the owner of all of said four lots aforesaid except lot 10 in block 3, as to which a foreclosure in his favor is pending.

"6. That the said J. E. Mitchell was at all times above named the duly authorized agent and representative of the defendant, and as such negotiated with plaintiff about the time said mechanic's-lien contracts were executed as aforesaid, with reference to the defendant furnishing the material and labor for the construction of each of said houses aforesaid, which negotiations resulted in an agreement between the said J. E. Mitchell and plaintiff that Houston Lumber & Building Company would furnish all labor and material necessary to construct and complete each of said buildings, at its own cost and expense and that plaintiff would supervise the construction of each of said houses; that mechanic's-lien contracts would be executed by plaintiff in favor of the said J. E. Mitchell, for convenience only; that the said J. E. Mitchell was not to get any compensation from plaintiff at all, and that after taking such mechanic's-lien contracts from plaintiff he would assign them to defendant, which would furnish the necessary material for the construction of said buildings, and would furnish plaintiff with the necessary cash to pay all labor bills; that the prices which plaintiff was to pay for said material was figured by said Mitchell upon a unit-price basis for various kinds and classes of material and that said Houston Lumber & Building

Company would furnish such material on the unit-price basis, but it was not then known how much material would be required for said houses nor the class nor dimensions, except generally; but that said houses would be constructed by plaintiff, and after the completion of the same, plaintiff would endeavor to refinance said properties by obtaining as large first lien loans on each of said houses as the market would afford, and that out of such first-liens, or the sales thereof, the Lumber Company should be reimbursed for all cash advanced by it for labor as aforesaid, and that it should be paid for all material furnished for the construction of said houses, and the remainder, if any, should belong to plaintiff; and in connection with said refinancing it was contemplated that plaintiff would not be able to obtain a loan of $4,000.00 on each of said properties, but that after said refinancing was undertaken and completed and the Lumber Company was reimbursed for cash for labor advanced by it, and after it was paid its unit-prices for said material, it was not to have any further interest in the property or lien upon the same, but plaintiff was to remain the owner of said property and be entitled to all profits in each job or as to each parcel of property after the payment of said labor and material bills. These negotiations and agreements between plaintiff and said J. E. Mitchell were made known to the defendant and were accepted by it and it bound and obligated itself to furnish said material and to advance the necessary cash to pay labor bills, whereupon the said J. E. Mitchell, with the consent of plaintiff, assigned said mechanic's-lien contracts aforesaid to said defendant, after which plaintiff proceeded to commence and complete the construction of each of said buildings. Except as hereinafter stated, the Lumber Company furnished the material necessary to construct buildings, and also furnished the necessary cash to pay labor bills in the construction of said improvements.

"7. That during the construction of said buildings, the defendant furnished cash to pay labor bills, as stated below, and furnished material for the construction of said houses for which it charged the sums of money stated below, as follows: * * * Total $8,287.22.

"That the above cash and material did not cover plumbing, electrical work, tile work, mill work, shades, paint nor paper for said houses; that plaintiff purchased and contracted to pay therefor from others than the defendant at the special instance and request of said defendant, which obligated itself to pay therefor, agreeing to pay therefor, for each house the reasonable prices therefor for each house, the following items at the prices named below, or a total of $2,076.00 for the four houses, which added to the $8,287.22 above named, made a total of $10,963.22, as the actual cost of said four houses to plaintiff at the price named above.

"That said defendant has not paid said paint and paper bills nor said shade bills as it agreed to do, said paint and paper bills being the aggregate sum of $520.00 and said shade bills being the aggregate sum of $76.00, or a total of $596.00.

"That at the time said mechanic's-lien contracts were executed as aforesaid, it was then known to all parties to said transaction that there existed a lien on each respective parcel of property aforesaid, to secure the payment of $500.00 of the purchase-money therefor which plaintiff had obligated himself to pay said Scott Shambaugh, and it was understood and agreed by plaintiff, the said J. E. Mitchell and the defendant, that when said refinancing was done, said $500.00-notes should be paid out of the funds realized from said refinancing, so that it required the total sum of $12,963.22 to pay said notes, to reimburse said Houston Lumber & Building Company for the cash it had advanced to pay labor bills, and to pay it the charges it had made against plaintiff for material furnished by it and for material which it agreed to pay for, such as it did not have in stock such as plumbing, electrical work, tile work, mill work, painting and papering and shades. The defendant retained said mechanic's-lien contracts aforesaid, and during the construction of said buildings, it pledged them as collateral security for loans made it, so that at the conclusion of said construction it was not in a position to release them to plaintiff upon payment of the sums of money due said defendant as aforesaid.

"8. Prior to the transactions above named, plaintiff and defendant had many other transactions of a nature similar to those set forth above, out of which a controversy had arisen between plaintiff and defendant as to the rights of the parties, the defendant claiming that plaintiff was indebted to it in various sums of money on other jobs between them as follows, and totaling $24,152.70.

"Plaintiff alleges, however, that at the unit-prices which plaintiff had agreed to pay for said material, and for the material actually furnished, and used in the construction of said building, the defendant should not have charged plaintiff in excess of the amounts set forth below on the jobs listed below, and totaling $23,463.48, being an overcharge of $689.22. In addition to these over-charges, said defendant failed to credit plaintiff with screens, $147.42, Rosk $62.00, and Shiplap $96.00, charged for but not used by plaintiff and which was returned to said defendant, being the further total sum of $305.00, making a total overcharge of $994.22 growing out of all sixteen items or jobs, aforesaid.

"That at the time of the completion of said jobs 12, 14, 15 and 16 aforesaid, the defendant was claiming that plaintiff owed it $1,-

146.55 on all jobs aforesaid other than jobs 12, 14, 15 and 16, as well as the $10,963.32 as to jobs 12, 14, 15 and 16, aforesaid, so that prior to April 16, 1932, and on said day and date, there was a bona fide controversy between plaintiff and said defendant as to the amount which plaintiff was due said defendant, and the defendant requested plaintiff to take such steps as were necessary to refinance said properties, but plaintiff refused to do so until said differences were adjusted and credits allowed plaintiff as contended for hereinabove. At that time, said defendant had not paid many of the claims of material furnishers who furnished materials for said jobs 12, 14, 15 and 16 aforesaid, and was being pressed for payment therefor; and the creditor or creditors with whom said defendant had pledged said mechanic's-lien contracts, were pressing said defendant for repayment of loans made against them, and as an inducement to plaintiff to take such refinancing steps, said defendant represented to plaintiff that it would endeavor to get the unpaid creditors on said job, to accept seventy-five per cent of their claims in full payment thereof on said jobs and that it would likewise discount its claims on said four jobs, as to material, twenty-five per cent; that said defendant did not pay the claims for paint and paper nor for shades, as set forth above. That twenty-five per cent of the material claims of said defendant against plaintiff on said jobs 12, 14, 15 and 16 is the sum of $1,475.93 of the amount charged plaintiff therefor.

"In this situation the defendant represented to plaintiff that it was absolutely essential that it raise money to pay off the loans to which the mechanic's-lien contracts had been pledged; that it could not do so unless plaintiff would renew and extend said obligations and that if plaintiff would take the necessary steps to renew and extend such obligations, changing the form of such indebtedness so that each mechanic's-lien contract would be renewed and extended so as to procure as large a first-lien loan on the properties as the market would afford, the remainder to be represented by second-lien notes for the remainder of the $4,000 original obligation in each case, then that when said first-lien loans were placed by said defendant, it would release the plaintiff from any personal liability on said second-lien notes, and would cancel the same and release the liens securing the same and by such means said four properties would then only be charged with the amount of said proposed first-liens on each of said properties; that said proposed refinancing proposition, or program, would enable said defendant to liquidate its loans for which said mechanic's-liens had been pledged and release them so that they could be released to the plaintiff on said four properties. That as an accommodation to said defendant, and relying upon such promises and statements aforesaid, plaintiff joined by his wife, did on the dates set forth in paragraphs 1, 2, 3 and 4 of this petition renew and extend said obligations on each of said properties described in said paragraphs 1, 2, 3 and 4 of this petition, by the execution of the notes and deeds of trust therein described and delivering them to said defendant.

"That as a result of said refinancing being done as aforesaid, the defendant sold said four first-lien notes aggregating $9,500.00 and got the money therefor and out of the proceeds thereof paid the $2,000.00 first-lien notes originally executed by plaintiff to Scott Shambaugh as aforesaid, leaving the net sum of $7,500.00 which said defendant got out of the sale of said first-lien notes. That it did not pay the paint and paper bills amounting to $520.00 nor the shade bills amounting to $76.00; that it did not credit plaintiff with the $994.22 overcharges set forth above, and it has not so far allowed plaintiff a credit of twenty-five per cent discount on its material bills on said jobs 12, 14, 15 and 16, as it agreed to do, namely $1,475.93 and that plaintiff is entitled to a credit of $10,546.15 on said $10,963.22 claimed by said defendant against him, leaving only the sum of $417.07 as the largest amount under any state of facts which said defendant claimed against him at any time, even if no agreement had been made between them to cancel said notes in their entirety and release the lien securing the same.

"Plaintiff says that if said defendant had not promised plaintiff before he signed said renewal and extension-notes and the deeds of trust securing the same, that said credits aforesaid would be allowed him and that said second-lien notes would be canceled and held for naught and that the liens securing said second-lien notes would be released and discharged after said refinancing was over, plaintiff would not have executed the same nor permitted his wife to join him in the execution thereof, but he relied upon such promises, which were material in inducing him and his said wife in executing said papers.

"9. That notwithstanding said agreements aforesaid, said defendant did not allow plaintiff said credits as aforesaid, and although it did release him from personal liability on said second-lien notes, it did not release the liens securing the same, but on the contrary, in violation of said agreement, upon failure to pay the first installment of principal and interest as called for in each of said notes, declared the whole of the same due and payable, and instructed the respective trustees in said deeds of trust, namely, the defendants, W. P. Neblett, who was Trustee in two of them, and Minor Stewart, who was Trustee in two of them, to advertise and sell said properties, and said trustees did advertise

said properties for sale for the first Tuesday in July, whereupon plaintiff filed his original petition herein."

This court can neither agree with appellant that a good cause of action has been thus stated, nor that the authority he cites as in support of one (Edward Thompson Company v. Sawyers, 111 Tex. 374, 234 S. W. 873), is applicable to the situation here presented; on the contrary, these outstanding and repellent features appear upon the face of his pleading: That the original contracts of himself and wife reflected in the mechanics' liens and deeds of trust were contractual in nature, were in writing, and recited their express obligations to pay specific amounts for each building in a separate and distinct undertaking; that, after the transfer thereof from the original contractors to the appellee here, they, with full knowledge of all of the terms of these prior express agreements of their own, executed additional obligations, likewise in writing, reaffirming as being still outstanding the previously stipulated amounts and again expressly agreeing to pay the same; that the other thirteen transactions are so pleaded in off-set and counterclaim only, and are plainly stated to have been distinct transactions independent of and having no connection with the notes and liens here primarily sued upon; that the extension agreements were on the terms and for the amounts originally contemplated by all the parties and were merely renewals that appellant and his wife had so formerly then agreed in writing to make, and there is no allegation whatever that any agreements were made by the appellee to do any work different from or in addition to what was provided for in the agreements as originally written: finally, there is no averment of any sort to the effect that any of the contracts, whether written or verbal, were entered into by the appellee with the intent on its part not to carry them out.

This résumé of the averments makes plain, it seems to us, that appellant's position here in effect is that he may, through proof of prior oral agreements to that effect, show that his expressly stated written agreements to pay stipulated sums, as well as express written renewals of such prior obligations, were in fact obligations to pay a different or less sum; that such expressed obligations and the written contracts were not intended to be really fulfilled at all; and that a subsequent refusal to cancel, or at least to reduce, the amount so stipulated to be paid constitutes such legal fraud as would vitiate them. If that be a correct appraisal of the facts so alleged by him, which for the purposes of the demurrers must be taken as true, it is clear that neither the case he relies upon, nor the authorities generally, uphold the view that any right of action appears here; to the contrary, it seems clear that—no accident or mistake in either the procurement, the execution, or the delivery of these written contracts, having been alleged—there was, first, no such fraud alleged as would vitiate these undertakings, and, second, no consideration shown for the claimed agreement of the appellee not to enforce the entire liability of the appellant on the notes, mechanics' liens, and deeds of trust. These authorities are cited as supporting these conclusions: Pridgen v. Furnish (Tex. Com. App.) 23 S.W.(2d) 307; Rogers v. Rogers (Tex. Com. App.) 15 S.W.(2d) 1037; 17 Texas Jurisprudence, "Evidence in Civil Cases," chapter 13, §§ 352–402.

In the Sawyers Case, the one upon which appellant relies, it was averred that the promise to issue and furnish the supplementary books had been originally made in fraud and deceit, with the knowledge that it could not be complied with, and with the original intent not to undertake to do so; that obviously differentiates it from the cause here presented, where, as recited, there is no intimation—either originally or at the time of the extension agreements—that this appellee did not intend to carry out all of its undertakings; and it further indisputably appears from the appellant's own mouth that the renewal agreements were merely the ones he had obligated himself originally to make when the time came to later enter into them.

Further discussion is deemed unnecessary, since these conclusions determine the merits of the appeal; a judgment affirming that of the learned trial court has accordingly heretofore been entered.

Affirmed.